**ST. BARNABAS HOSPITAL, Plaintiff,**

v.

**Tommy G. THOMPSON, Secretary, Department of Health and Human Services, Defendant.**

**No. 00 CIV. 6399 (LAK).**

United States District Court, S.D. New York.

April 19, 2001.

Murray J. Klein, Steven M. Ziolkowski, Reed, Smith LLP, for Plaintiff.

Edward Chang, Assistant United States Attorney, Mary Jo White, United States Attorney, for Defendant.

### MEMORANDUM OPINION

KAPLAN, District Judge.

This case presents the question, said to be one of first impression, whether the Administrator of the Health Care Financing Administration ("HCFA") acted improperly in applying a 5.8 percent cost reduction mandated by Congress in computing reimbursement of hospitals for outpatient services to inpatient services as well. Plaintiff has moved for summary judgment. The government contends that summary judgment should be entered in its favor.

### Facts

The facts are entirely undisputed and the case is ripe for disposition by motion. Unfortunately, one first must comprehend the basics of certain of the methods by which the Medicare program has reimbursed service providers for their efforts.

### The Medicare Program

The Medicare program was established by Title XVIII of the Social Security Act and is a federally funded insurance program for the aged, disabled, and certain individuals with end stage renal disease.[1] Each fiscal year, a Medicare provider—in this case, plaintiff St. Barnabas Hospital—files a cost report, which is audited on behalf of the Secretary of Health and Human Services and the HCFA by the provider's fiscal intermediary. Upon completion of the audit, the intermediary issues a notice of program reimbursement ("NPR"), which indicates the amount that the Medicare program will reimburse the provider for the fiscal year in question. The provider then has a right to appeal first to a Provider Reimbursement Review Board ("PRRB") and then to the HCFA Administrator following which it may bring an action such as this in an appropriate district court for judicial review.[2]

---

1. *See* 42 U.S.C. § 1395 *et seq.*

2. *See generally Rye Psychiatric Hosp. Ctr. v. Shalala,* 52 F.3d 1163, 1165–68 (2d Cir.), *cert.* *denied,* 516 U.S. 913, 116 S.Ct. 299, 133 L.Ed.2d 205 (1995).

*Part A and Part B Reimbursement*

Broadly speaking, the Medicare program is divided into Part A, which governs hospital inpatient services, and Part B, which covers statutorily defined "medical and other health services," as well as physician and related costs. Part A is mandatory and covers many inpatient hospital services for covered persons, although it is limited in various ways such as providing coverage only for a limited number of days per "spell of illness." Part B is an optional, supplementary insurance program covering "medical and other health services" not covered by Part A.[3] The statutory definition of "medical and other health services" under Part B, however, does not include services provided to hospital inpatients.[4]

For many years, Medicare reimbursed hospitals for both Part A and Part B services on a reasonable cost basis, i.e., the hospital reported its costs to the fiscal intermediary, which determined the extent to which the costs incurred were reasonable. The provider then was reimbursed for those reasonable costs. But this system tended to reward inefficient hospitals and, in any case, resulted in upwardly spiraling program costs. So Congress took a number of measures designed to contain Medicare costs including the adoption of a prospective payment system first for Part A services[5] and, effective in or after 2000, for Part B as well.

Among the cost-containment measures Congress adopted was the provision at issue in this case:

"The Secretary shall reduce the reasonable cost of outpatient hospital services (other than the capital-related costs of such services) otherwise determined pursuant to section 1395*l* (a)(2)(B)(i)(I) of this title by 5.8 percent for payments attributable to portions of cost reporting periods occurring during fiscal years 1991 through 1999 and until the first date that the prospective payment system under section 1395*l* (t) of this title is implemented."[6]

In other words, Congress mandated that the reasonable costs of hospital outpatient services determined by the fiscal intermediaries be cut by an additional 5.8 percent across the board, which of course reduced the level of provider reimbursement for hospital outpatient services. Not surprisingly, the Secretary adopted a regulation essentially tracking the language of the statute.[7]

*The Present Controversy*

The final piece of the jigsaw puzzle that enables one to understand the nature of the parties' dispute here is this: As noted in passing above, Medicare Part A—which covers hospital inpatient services—provides limited benefits. A covered patient, for example, might remain hospitalized for a number of days that exceeds that for which Part A benefits are provided and thus exhaust the patient's Part A coverage.

In 1968, the Secretary established a policy of reimbursing under Part B for Part A services provided to patients who (a) were covered by Part B, but (b) had exhausted their Part A benefits, provided only that the services would have been covered under Part A but for the exhaustion of Part A benefits. In other words, the Part A

---

**3.** *See* 42 U.S.C. § 1395k; *see also id.* § 1395*l* (d).

**4.** *See id.* § 1395x(s).

**5.** *See generally Rye Psychiatric Hosp.,* 52 F.3d at 1165, 1167–68.

**6.** 42 U.S.C. § 1395x(v)(1)(S)(ii)(II).

**7.** 42 C.F.R. § 413.124.

services provided to these patients were treated as if they had been provided on an outpatient basis and reimbursed under Part B. It is the intersection of that policy with the 5.8 percent cost reduction for outpatient services mandated by Congress for fiscal years 1991 and following that gives rise to this case.

St. Barnabas submitted its cost form for fiscal year 1992 to its intermediary on an HCFA-prescribed form. The form required that the costs of providing inpatient services to patients who had exhausted their Part A benefits be reported as costs of providing outpatient services—consistent with HCFA's policy of treating such services *as if* they had been provided to outpatients. The apparent effect of doing so was to apply the 5.8 percent cost reduction to those inpatient costs and thus to reduce the reimbursement due to the hospital for 1992, allegedly by approximately $25,000. The fiscal intermediary saw it precisely that way and applied the cost reduction. St. Barnabas appealed to the PRRB, claiming in substance that the 1990 amendment to the statute contemplated application of the 5.8 percent cut only to the costs of outpatient services, and the PRRB reversed. But review was sought by the HCFA Administrator, who reversed the PRRB and reinstated the decision of the intermediary. It is that ruling which St. Barnabas here seeks to overturn.

## Discussion

■ St. Barnabas reads the 1990 amendment mandating the 5.8 percent cut in reasonable costs of outpatient services as if it required a 5.8 percent cut *only* in the reasonable costs of outpatient services. It argues principally that the Administrator acted contrary both to the statute and to his own implementing regulation by applying the 5.8 percent cut to those inpa-

tient services reimbursed under Part B. But the hospital's argument is unpersuasive.

Neither the statute nor the regulation upon which the hospital relies says what the hospital wishes it said. Neither provides that the 5.8 percent cut is to be applied *only* to the costs of outpatient services. Each provides simply that the 5.8 percent cut applies to the costs of outpatient services. And the suggestion that this implies that the cut was not to be applied to the costs of inpatient services does not carry the day here for two reasons.

First of all, this is not a situation in which Congress enacted a statute providing for the reimbursement of both kinds of costs and then later enacted a new provision requiring a reduction in the costs used to determine the amount of reimbursement for only one of them. On the contrary, Congress never mandated reimbursement under Part B of the cost of providing inpatient services (normally covered under Part A) to participants who had exhausted their Part A benefits. That extension of coverage was effected by administrative interpretation by the Secretary. Hence, the inference of Congressional intent to exclude such inpatient costs from the 5.8 percent cut that St. Barnabas would have the Court draw, while not entirely implausible, is not compelling.

■ This becomes especially significant when considered from the perspective of the Court's limited role here. While the Court of course is obliged to "give effect to the unambiguously expressed intent of Congress,"[8] the Court is obliged to give very substantial deference to the interpretation of the statute by the administrative

8. *Good Samaritan Hosp. Reg'l Med. Ctr. v. Shalala*, 85 F.3d 1057, 1060 (2d Cir.1996) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (internal quotation marks omitted)).

official charged with carrying out this program. As the Second Circuit held in *Rye Psychiatric Hospital v. Shalala*,[9] another Medicare reimbursement review case, the Secretary's interpretation of the statute "is controlling unless it is unreasonable."[10]

The hospital has failed to articulate any persuasive basis for concluding that the Secretary's interpretation of Section 1395x(v)(1)(S)(ii)(II) as leaving the determination whether, how and to what extent to reimburse inpatient costs under Part B for patients who had exhausted their Part A benefits entirely to the Secretary's discretion is unreasonable. Its only significant effort to do so is its contention that Congress on occasion has evidenced its understanding of differences between Part B outpatient and Part B inpatient services.[11] Even assuming that the premise is correct, however, the conclusion does not necessarily follow. The fact that Congress has recognized such a distinction in another context does not inevitably mean that it intended that a statute mandating a 5.8 percent cut of costs of Part B outpatient services would foreclose the Secretary from making such a cut with respect to Part B inpatient services. In any case, it surely does not demonstrate that the Secretary acted unreasonably or arbitrarily in concluding that Section 1395x(v)(1)(S)(ii)(II) was not so intended.

### Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is denied. Further, as summary judgment may be granted in favor of a non-moving party if there is no genuine issue of material fact, and as plaintiff had ample notice of the defendant's request for summary judgment and a full opportunity to respond, the Court grants the defendant's request and enters summary judgment dismissing the complaint.

SO ORDERED.

---

9.  52 F.3d 1163.

10.  *Id.* at 1168 (citing *Chevron U.S.A., Inc.*, 467 U.S. at 843–45, 104 S.Ct. 2778).

11.  Pl. Mem. 11–13.